**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

**BLACK EARTH MEAT MARKET, LLC**
1345 Mills Street
Black Earth, WI 53515,

and

**KEMPER BARTLETT DURAND, JR.**
1345 Mills Street
Black Earth, WI 53515,
                              Plaintiffs,

v.                                              Civil Action No.: 14-CV-674

**VILLAGE OF BLACK EARTH**
1210 Mills Street
Black Earth, WI 53515,

**PATRICK TROGE**
1525 Riverview Drive
Black Earth, WI 53515,

**PATRICK FREY**
401 Red Hawk Court
Black Earth, WI 53515,

**TED PRITCHETT**
1625 Blue Mounds Street
Black Earth, WI 53515,

**THOMAS PARRELL**
2133 Center Street
Black Earth, WI 53515,

**JAMES COYLE**
1504 Horseshoe Circle
Black Earth, WI 53515,

**BETH MARTY**
2133 Center Street
Black Earth, WI 53515,

and

**WALT MILLER**
2118 Center Street
Black Earth, WI 53515,

Defendants.

---

## THIRD AMENDED COMPLAINT

---

Plaintiffs, Black Earth Meat Market, LLC and Kemper Bartlett Durand, Jr., by their attorneys, Fuhrman & Dodge, S.C., by Attorneys Todd M. Pfeil, Christopher J. Dodge and Brittany A. Wilson, and as and for their Amended Complaint against the above-named Defendants allege and show the Court as follows:

### PARTIES

1.      Plaintiff, Black Earth Meat Market, LLC ("BE Meats"), is a limited liability company duly organized and existing under and by virtue of the laws of the State of Wisconsin with its principal office located at 1345 Mills Street, Black Earth, Wisconsin 53515.

2.      Plaintiff, Kemper Bartlett Durand Jr. ("Durand"), is the managing member, investor and a registered agent of BE Meats, and is an adult resident of Dane County, with a business address of 1345 Mills Street, Black Earth, Wisconsin 53515.

3.      Defendant, Village of Black Earth (the "Village"), is a municipal corporation located in Dane County with an office located at 1210 Mills Street, Black Earth, Wisconsin 53515.

4.      Defendant, Patrick Troge (" President Troge" or "Troge"), is the President of the Village, and is an adult resident of Dane County, residing at 1525 Riverview Drive, Black Earth, Wisconsin 53515.

5.      Defendant, Patrick Frey ("Trustee Frey" or "Frey"), is a Trustee of the Village, and is an adult resident of Dane County, residing at 401 Red Hawk Court, Black Earth, Wisconsin 53515.

6. Defendant, Ted Pritchett ("Trustee Pritchett" or "Pritchett"), is a Trustee of the Village, and is an adult resident of Dane County, residing at 1625 Blue Mounds Street, Black Earth, Wisconsin 53515.

7. Defendant, Thomas Parrell ("Trustee Parrell" or "Parrell"), is a Trustee of the Village, and is an adult resident of Dane County, residing at 2133 Center Street, Black Earth, Wisconsin 53515.

8. Defendant, James Coyle ("Trustee Coyle" or "Coyle"), is a Trustee of the Village, and is an adult resident of Dane County, residing at 1504 Horseshoe Circle, Black Earth, Wisconsin 53515.

9. Defendant, Beth Marty ("Trustee Marty" or "Marty"), is a Trustee of the Village, and is an adult resident of Dane County, residing at 2133 Center Street, Black Earth, Wisconsin 53515.

10. Defendant, Walt Miller ("Trustee Miller" or "Miller"), is a Trustee of the Village, and is an adult resident of Dane County, residing at 2118 Center Street, Black Earth, Wisconsin 53515

11. Defendants Troge, Frey, Pritchett, Parrell, Coyle, Marty, and Miller (collectively referred to as "Village Trustees"), are now, and at all times material to this action were, duly appointed, employed, and attempting to act as Village Trustees in the Village of Black Earth, a municipal corporation and governmental subdivision of the State of Wisconsin.

12. Defendant, the Village, is now, and at all times material to this action, a municipal corporation and subdivision of the State of Wisconsin.

13. Each and all of the alleged acts of Defendants were done by them under the alleged color and authority of the statutes, ordinances, regulations, customs and usages of the Village of Black Earth, Wisconsin, and the State of Wisconsin, and under the alleged authority of their

positions as Village Trustees for the Village of Black Earth. While the Defendants attempted to act in accordance with Wisconsin law, Defendants failed to do so thereby eliminating any immunity under the Wisconsin Statutes.

## HISTORY OF THE USE OF PROPERTY AT 1345 MILLS STREET

14. BE Meats is the owner of real estate located in the Village of Black Earth at 1345 Mills Street, Black Earth, Wisconsin 53515 (the "Property").

15. Prior to BE Meats' purchase of the Property, the Property was continually used as a slaughterhouse, with retail sales occurring as an ancillary use; such was the use of the Property for a period in excess of sixty years.

16. Prior to BE Meats' purchase of the Property, the use of the Property as a slaughterhouse was deemed a permissible or legal, non-conforming use under applicable Village zoning code.

17. BE Meats purchased the Property in 2001 for the purpose of continuing to operate a slaughterhouse with retail sales to occur as an ancillary use in accordance with the existing legal non-conforming use.

18. Since BE Meats' purchase of the Property, BE Meats' use of the Property has always been that of a slaughterhouse, with retail sales occurring as an ancillary use on site. The use of the Property has not changed in over 60 years.

19. Under Wisconsin law the mere increase in the volume, intensity or frequency of a legal non-conforming use is insufficient to invalidate a legal non-conforming use.

20. BE Meats, at all times, met the requirements of the zoning codes by complying with Wisconsin legal requirements pertaining to legal non-conforming uses. While the volume and frequency of slaughter increased at BE Meats there was no identifiable change or extension of the building that would invalidate a legal non-conforming use.

4

21.     BE Meats complied with all federal, state and local requirements for a slaughtering business.  A United States Department of Agricultural ("USDA") inspector was on site for a significant portion of the work week documenting the humane treatment of animals, noise level of the animals, monitoring proper slaughtering practices, and ensuring proper disposal of animal rendering.

22.     BE Meats has, at all times, operated in a manner that is reasonable causing no substantial interference with the comfort, enjoyment of life, health, or safety of any person.

**THE COMPLAINING INDIVIDUALS; VILLAGE BOARD OF TRUSTEES;
RIGHT TO FARM LAW; AND, SELECTIVE PROSECUTION OF
BE MEATS VIA MUNICIPAL CITATIONS**

23.     Approximately seven (7) individuals (the "Complaining Individuals") have made frequent and, upon information and belief, unsupportable complaints against BE Meats to individuals and entities, including the Village Trustees, Dane County Sheriff's Department Deputies (serving as contract Deputies with the Village of Black Earth) ("Contract Deputies"), the State Department of Health, and the State Department of Natural Resources.  Such complaints allege animal noises, truck traffic, offal removal and odors as the basis for the complaints (collectively, the "Complaints").  All seven (7) of these Complaining Individuals, purchased their homes knowing a slaughter operation was being conducted next to them.

24.     Despite repeated complaints of the Complaining Individuals, the State Department of Health and the State Department of Natural Resources have found no violations with respect to the operation of BE Meats.

25.     Wisconsin has codified what is called the "Right to Farm Law."  This law can be found at Wis. Stat. § 823.08 et seq.  The general purpose of this statute is to prevent individuals and Villages from filing public or private nuisance claims against agricultural operations.  The

Village Trustees and its counsel have ignored this statute in declaring BE Meats a public nuisance.

26.     The Complaining Individuals created an "anti-Black Earth Meats, LLC Facebook page" and made numerous derogatory posts with regard to Black Earth Meats. Upon information and belief, the Facebook page was shut down at the request of the USDA due to Ms. Mary Mickelson, one of the Complaining Individuals, video-taping USDA inspectors who were on site. The video-taping or taking of photographs of USDA inspectors violates Federal law.

27.     The Complaints were made with the stated intent of harassing BE Meats and impeding its business activities. The sole intent of the Complaints was to force BE Meats to move its legal, non-conforming slaughtering operation out of the Village of Black Earth.

28.     As a result of the Complaints, the Contract Deputies began issuing citations that were repeatedly dismissed by the Village Attorney at that time, David Ege ("Village Attorney Ege"). The Contract Deputies sought the assistance of the Village Trustees, but because the Village Trustees did not normally handle enforcement of the applicable Village Ordinances, the Village Trustees instructed the Contract Deputies to seek the advice of Village Attorney Ege prior to issuing a citation to gauge each citation's application.

29.     When the Contract Deputies contacted Village Attorney Ege, however, Village Attorney Ege allegedly did not provide guidance. Based upon information and belief, Village Attorney Ege was unable to provide proper guidance because the ordinances upon which the citations were based were vague, ambiguous, and unconstitutional on their face, and the citations issued would lack a basis in law and fact.

30.     At the July 10, 2013 Village Board meeting, the Village Trustees acknowledged the difficulty in applying and enforcing existing Village Ordinances as they sought Village

Attorney Ege's advice as to what may or may not be an enforceable violation of the same. As a result of this difficulty, the Village Trustees discussed, at length, the creation of an ordinance that would only affect BE Meats. The Village Trustees also noted that in drafting an ordinance that would impact BE Meats, it was important to make sure the newly-drafted ordinance would not impact other local businesses. President Troge specifically asked Village Attorney Ege, at this time, "[s]o is there a way that we can tailor language to a specific business without affecting other businesses?" A copy of a portion of the audio recording for the July 10, 2013 Village Board Meeting detailing the Village Trustees' communications has been transcribed and attached as Exhibit A.

31. The Village Trustees met on several other occasions to further discuss the Complaints. At one of those meetings, Trustee Frey made a statement to the effect that he had to do something to get BE Meats out of town. Trustee Frey partially admitted making this statement at the Municipal Court proceedings regarding the citations.

32. The repeated, harassing Complaints; Trustee Frey's stated desire to get BE Meats out of town; President Troge's attempts to draft an ordinance that only applied to BE Meats; the Village Trustees' blatant disregard of Village Attorney Ege's belief that the citations were improper; the Village Trustees' unanimous instruction to the Contract Deputies that they no longer had to go through Village Attorney Ege before issuing citations; and, the Village Trustees' direction to the Contract Deputies to cite BE Meats at any time when it was not citing other businesses in Black Earth for similar behavior amounted to selective and harassing enforcement actions against BE Meats with respect to any alleged violation of Village Ordinances that might pertain to the Complaints, including engaging in actions beyond the discretion of the Contract Deputies, and notwithstanding that the violations could not be properly charged or sustained based on law or fact.

33. The selective enforcement actions against BE Meats is demonstrated by the discussions at the July 17, 2013 Village Police Committee meeting. At that meeting, Deputy Kartman asked for clarification as to whether he should issue citations to BE Meats and, if so, under which ordinance. Specifically, Deputy Kartman stated, "I know you guys just had a board meeting and you talked about some new ordinances that you wanted to address. And I guess I was just kind of hoping for some clarification as to which - - ordinances we are looking at now. I know there was one - - someone made a reference about the fact that they have those containers of waste that are outside the building. And once - - that they're outside the building and he can't keep them contained in his building, that that's a violation now." Officer Kartman continued, "is this something you want us to start writing citations for . . ." President Troge went on to conclude that BE Meats' actions would not qualify as a violation of one ordinance in particular. President Troge then directed Officer Kartman to use a separate ordinance, however, to cite BE Meats because the containers of waste "is a violation - - that would be a nuisance." Deputy Kartman then asked for confirmation, "[s]o is that something that you want us to start writing tickets for, like effective immediately?" and further clarified his question as being "my question is just - - my interpretation of the ordinance may be different than the Village attorney's . . ." President Troge neglected to address the Village attorney's interpretation of the matter, however, and immediately made a motion to have the Police Department send a warning letter to BE Meats threatening that citations would be received in the future, absent a change in behavior with respect to waste containers. President Troge's actions were approved unanimously by the Village Trustees sitting on the Village Police Committee.

34. Also at the July 17, 2013 Village Police Committee meeting, Deputy Kartman inquired with respect to an ordinance for the parking of vehicles over a certain length, as it pertains to the BE Meats' business. Deputy Kartman asked, "Is this also something that you

want us to send a warning letter regarding?" President Troge then advised against using a specific ordinance to issue citations to BE Meats at that present time because, technically, many other businesses had violated that ordinance and had not received citations for their violations. Rather, President Troge instructed that he preferred beginning by issuing citations for the waste products ordinance so that the Village Trustees' actions targeting BE Meats' business would be more discrete. Specifically, President Troge stated, "if we start changing ordinances to customize just to Black Earth Meats, it looks like, one, you're picking on one particular business; and two, it targets other businesses because they may take deliveries at a certain hour. So I would be more likely to . . ." "start with the other one, that waste product first." Nonetheless, Trustee Coyle confirmed that the Village Trustees would advise the Contract Deputies to selectively enforce the parking vehicles ordinance at a later date, following the enforcement of the waste products ordinance. Trustee Coyle stated, "We'll start with that. I mean, if it comes down to it where we need to" "we're going to need to." President Troge's and Trustee Coyle's actions were approved unanimously by the Village Trustees sitting on the Village Police Committee.

35. The Village Trustees further instructed the Contract Deputies, at the July 17, 2013 Village Police Committee meeting, to change their work schedules in an effort to police BE Meats' behaviors at the early hours of the morning. Specifically, Trustee Coyle asked, "We're wondering if the police department can change their schedule for a little while" for "Black Earth Meats" in order to cite the business for trucks still arriving before 7:00 a.m. As a result, Deputy Kartman agreed to police the BE Meats' business at 6:00 a.m., on a random basis. Trustee Coyle's actions were approved unanimously by the Village Trustees sitting on the Village Police Committee. A copy of a portion of the audio recording for the July 17, 2013

Village Police Committee Meeting detailing the Village Trustees' communications has been transcribed and attached as Exhibit B.

36.     The Contract Deputies proceeded according to the Village Trustees' directives by issuing eleven citations between October 1, 2013 to January 3, 2014, including numerous other citations for "public nuisance," "street pollution," "idling unattended vehicle," "permit obstructions to occur," and "noisy animals" (collectively, the "Citations"). Copies of the Citations are attached as Exhibit C. All citations were witnessed by one or two of the seven Complaining Individuals. Four of the Complaining Individuals acknowledged at the Municipal Court Proceeding that they had no knowledge of the facts supporting the citations.

37.     A citation issued on January 3, 2014, in particular, was issued under President Troge's direction. For that citation, President Troge contacted the Contract Deputies requesting that they document, based on President Troge's belief, a Village Ordinance violation. A citation was then issued to BE Meats for that alleged violation notwithstanding the fact that at no time did the investigating officer identify any complaining member of the public regarding that alleged violation.

38.     The Contract Deputies did not cite other businesses in town for blocking State Highway 78 (Mills Street) during morning rush hour so deliveries could be made by semi to a restaurant, and further did not cite other business owners for blocking streets so deliveries of product could be made via semi. This is contrary to the numerous citations for blocking a side street (Remington Street) that BE Meats received despite the fact that traffic could still pass.

39.     All of the resulting Citations lacked a basis in law and fact and have been defended on this, and other grounds. For example, the Citations were issued even in circumstances where the Contract Deputies had performed no investigation, where third parties

were responsible for the alleged conduct, and without a clear violation, on anyone's part, of the plain language of an ordinance.

40.     At all times during the course of the Complaints, BE Meats has taken actions, in good faith, to address the Complaining Individuals' stated concerns.  Such measures include: (i) changing delivery times; (ii) notifying drivers of parking requirements (iii) hiring a company called Sanimax to remove animal renderings in covered containers; (iv) spraying for flies; and (iv) disinfecting areas that came into contact with animal renderings numerous times per day. The Complaining Individuals, in response, continued to demand that the Village Trustees take action to remove BE Meats from the Village.

41.      Given the persistent demand to remove BE Meats' business from the Village, Village Attorney Ege recommended that the Village Trustees and the Complaining Individuals engage in mediation with BE Meats to resolve all differences.  BE Meats, in good faith, agreed to the mediation, including agreeing not to have the Complaining Individuals be responsible for any mediation costs.  Conversely, the Village Trustees and the Complaining Individuals, in a profound lack of good faith, refused to mediate and quashed any idea to reach a solution to, or mitigate, the alleged issues involving BE Meats.

42.     Upon information and belief, shortly after the failed mediation attempt, Attorney Ege's representation of the Village was unanimously terminated by the Village Trustee's because they were unhappy with the advice being provided by Attorney Ege.

43.     The Village of Black Earth replaced Attorney Ege, by a unanimous vote, whose office was two blocks from the Black Earth Village Hall, with Attorney William Cole from Fitchburg, WI.  Attorney Cole charges an hourly rate that is 25% higher than that charged by Millonzi Law, LLC, the firm with whom Attorney Ege was affiliated.  The Village Trustees, shortly after the dismissal of Attorney Ege, also terminated the services of Attorney Kay

Millonzi by a unanimous vote, once again showing that the Village Trustees were not fostering a relationship with local business in the community.

44.     Following the Citations, and after the Village Trustees and Complaining Individuals declined to engage in mediation, the Village held a special meeting of the Village Trustees on December 10, 2013, the purpose of which was to decide whether, and what kind of action, the Village might take against BE Meats.  The new Village Attorney, William Cole, was at this meeting, having been retained by unanimous vote of the Village Trustees in September 2013 on the recommendation of Trustees Parrell, Frey and Pritchett.  Thus, for several months, the Village paid for the services of two attorneys with respect to the same subject matter.

45.     A municipal hearing was held on April 21, 2014 and April 22, 2014 on the eleven Citations.  BE Meats was found guilty of all but two of the Citations.  BE Meats intentionally did not put on a defense to the Citations at the municipal court level.  The municipal court decision was appealed by both parties to the Circuit Court.  The Circuit Court granted BE Meats' Motion for Summary Judgment on October 10, 2014 declaring that "[t]he repeated issuance of citations by the [Village] against [BE Meats], seeking to have their business activities found to be a nuisance and to abate the longstanding agricultural use of their property is contrary to Wisconsin's Right to Farm law, whereas said business operations do not present a significant threat to the public health and or safety."  Since there was no significant threat to the public health or safety, BE Meats was found not to be a nuisance and all of the Citations were dismissed.  A copy of the Decision and Order on Defendant's Motion for Summary Judgment is attached as Exhibit D.

**VILLAGE OF BLACK EARTH TRUSTEES UNANIMOUS ACTION
TO DECLARE BE MEATS A PUBLIC NUISANCE;
DEROGATORY STATEMENTS OF PRESIDENT PAT TROGE
AND THE IMPACT ON BE MEATS BANKING RELATIONSHIPS**

46.     At the December 10, 2013 meeting, the Village, by unanimous vote of the Village Trustees, and without legal authority or authorization, determined that the slaughtering operation constituted a public nuisance, ordered BE Meats and Durand to discontinue their slaughter business use at the Property, and gave BE Meats and Durand 120 days to provide the Village with a plan to relocate its slaughter business elsewhere (the "First Resolution").  The Village's First Resolution was memorialized in a letter dated December 11, 2013 from President Troge to BE Meats.  A copy of the letter is attached as Exhibit E.

47.     On numerous occasions, President Troge, both verbally and in written form, attempted to support the decision of the Village Trustees regarding BE Meats by asserting through the press; Village residents; and at Board Meetings that BE Meats was impacting the sewer/water treatment plant and was a risk to an elementary school several blocks away.

48.     An Open Records Request of the Wisconsin Heights School District was conducted by counsel for Durand, and the Wisconsin Heights School District responded that it had no complaints on record pertaining to BE Meats.  A copy of the request to Wisconsin Heights School District is attached hereto as Exhibit F.  Thus, President Troge was attempting to spin the decision unanimously made by the Village Trustees with the intent of garnering public support utilizing "hot button" topics as discussion points.  The verbal and written statements made by President Troge were unfounded and baseless.  A copy of the response from the Wisconsin Heights School District is attached hereto as Exhibit G.

49.     Under Wisconsin law, the mitigation of a public nuisance, should one exist, must be done in a manner that results in the least impact to the business engaged in the public

nuisance. Despite the fact that a public nuisance did not exist and that BE Meats continued to operate in accordance with its legal non-conforming use zoning requirement, the Village Trustees ignored Wisconsin law and demanded, unanimously, and without basis in law or fact, the removal of BE Meats from the Village of Black Earth contrary to Wisconsin law.

50.     To finance the BE Meats business, BE Meats' business lender, the Bank of New Glarus, previously made a loan guarantee request to the United States Department of Agriculture Rural Development (the "USDA RD") under the Business & Industry Guaranteed Loan Program.

51.     The USDA RD issued a Conditional Commitment ("Commitment") to the Bank of New Glarus, to guarantee a business loan to BE Meats and Durand in the amount of $1.3 million for a term of 15 years with a 5.99% interest rate, which loan the Bank of New Glarus agreed to extend in January of 2014 (the "Loan"). The Loan would be used to refinance the BE Meats' business to accommodate equipment purchases and to pay off other high-interest rate loans.

52.     As outlined in the loan commitment documents, that the Bank of New Glarus and BE Meats executed, certain conditions had to be met before issuance of the Loan Note Guarantee ("Guarantee"). The conditions included, but were not limited to, the certification by the Bank of New Glarus that "[t]here has been neither any material adverse change in the Borrower's financial condition nor any other material adverse change in the Borrower, for any reason, during the period of time from USDA RD's issuance of the Conditional Commitment to issuance of the Loan Note Guarantee regardless of the cause or causes of the change and whether or not the change or causes of the change were within the Lender's or Borrower's control." The conditions further included, but were not limited to, the certification by BE Meats that "[t]here are no actions, suits or proceedings pending or, to the knowledge of the Borrower/guarantors,

14

threatened against the Borrower/guarantors that may result in any material adverse change in the business operations, or assets, or in the condition, financial or otherwise, of the Borrower/guarantors."

53.     Due to the Village Trustees' demand that BE Meats relocate the business under the First Resolution, Bartlett Durand, in accordance with loan requirements, advised the bank and the USDA RD of the Village of Black Earth's unanimous motion by the Village Trustees. As a result, the USDA RD rescinded its prior Commitment to issue the Guarantee for the Loan, pending an allotment of six (6) months to resolve the issue.  The Bank of New Glarus, in turn, sought to revisit the terms of the Loan, including whether to enter a contract to lend to BE Meats at all or whether to contract with BE Meats and Durand under stricter loan terms.

**BE MEATS ATTEMPTS TO FIND SOLUTIONS TO SATISFY
THE VILLAGE TRUSTEES; THE VILLAGE TRUSTEES
IGNORE THE VERY PLAN THEY REQUIRED OF DURAND
<u>AND THE ULTIMATE TAKING OF DURAND'S PROPERTY</u>**

54.     In April of 2014, the Village granted a ninety (90) day extension to the one hundred and twenty (120) day deadline by which BE Meats must provide the Village Trustees with a plan to relocate the slaughter business, as established at the December 20, 2013 Village Board meeting.

55.     Durand continued to interview economic development consultants during that time extension.  Durand eventually selected the Economic Development Partners ("EDP") as a company that could provide possible solutions to relocate the slaughter business and, therefore, could serve to provide the Village of Black Earth with the requested plan.  Durand then researched, and identified, a grant from Alliant Energy that could be used to pay for EDP's services.  Durand individually completed the application for the grant and presented it for the Village Trustees' approval to allow EDP to work with BE Meats on options for the slaughter

business. The Village Trustees only role in that process was to sign the grant application, once presented before them, and the Village did, in fact, sign the grant application. The Village paid zero ($0) for this grant and did no work to assist Durand in finding the grant. Durand's application was ultimately successful, as he obtained the Alliant Energy grant and began working with EDP's consultants to prepare a plan.

56. EDP sought to explore four options, including the location of BE Meats' location, and to evaluate the financial and physical feasibility of each option.

57. Durand met with EDP's consultants on numerous occasions and worked fully and cooperatively with EDP in assembling the possible options to be presented to the Village.

58. On June 26, 2014, at a Special Meeting of the Village Board, and at Durand's direction, EDP's Consultants presented BE Meats' plan to the Village Trustees in the form of four options. Generally, the options were: (1) BE Meats would purchase the neighboring properties; (2) BE Meats would reduce the amount of slaughtering to occur one day per week and would then outsource the remaining slaughtering; (3) BE Meats would cease all slaughtering activities and outsource all meat slaughtering; or (4) BE Meats would relocate the entire slaughter business to either a new location in the Village of Black Earth or to a location in another community (the "Proposed Plan"). Each option posed significant costs for implementation that would require public and private assistance.

59. Durand was not permitted to speak during the presentation at the June 26, 2014 Special Meeting and no questions were asked of Durand. The Village Trustees merely listened to the presentation. Despite requesting such a plan in December 2013, the Village Trustees engaged in no discussion regarding the presentation or the options under the Proposed Plan.

60. Shortly after the June 26, 2014 meeting, Durand followed-up with the Village Trustees, informing them of his willingness to work with the Village on any option presented in

the Proposed Plan.  Durand also informed the Village Trustees of the urgency and critical nature in selecting one of the options in the Proposed Plan, given the USDA RD's forestalled issuance of its Guarantee for the Loan based on the Village Trustees' declaration under the First Resolution that the slaughtering operation was a public nuisance.

61.     Although Durand had provided the Village with four options to remove his slaughter operation, each of the options would have resulted in monetary damage to BE Meats. Thus, even with the four options available, Durand would not be made whole, but rather would attempt to mitigate or lessen his damages.

62.     At a subsequent Village Board meeting held on July 2, 2014, Durand again explicitly informed the Village Trustees that if the Village did not work with Durand on one of the four options presented in the Proposed Plan, and allow the continuation of slaughter for the time being until the parties were able to carry out one of the four options in the Proposed Plan, the USDA RD would be unable to issue the Guarantee and the Bank of New Glarus would then be unable to extend the Loan.

63.     Specifically, at the July 2, 2014 Village Board meeting, Durand indicated that the Village Trustees' passage of the First Resolution declaring the slaughtering operation a public nuisance "caused a whole nightmare in financing plans" for the business because the entire business was built on slaughtering and removing the slaughtering capability essentially removed the business.  As a result, Durand informed the Village Trustees that BE Meats was "about to go into the catastrophic phase," as he could not obtain financing for the business absent passage of a motion permitting slaughter to resume.  He stated, "right now you guys have me completely pinned in the corner.  And I have no choice" and "we need to put a full stop to all the legal side of things and not have a bank take the loan away."  To permit slaughter to resume, Durand requested that the Village Trustees approve a motion that specifically stated: "Slaughter is

permitted at the Black Earth Meats facility under current zoning. It's a legal nonconforming use. As such, the Board affirms that slaughter shall be permitted to continue, and the normal operation of the slaughter business is not a public nuisance" ("Durand's Proposed Motion"). A copy of a portion of the audio recording for the July 2, 2014 Village Board Meeting detailing Durand's communications to the Village Trustees has been transcribed and attached as Exhibit H.

64. The Village Trustees again did not discuss any options under the Proposed Plan nor did they discuss or take any action on the proposed Motion on July 2, 2014; rather, President Troge advised Durand that the Village Trustees would direct Village Attorney William Cole to review the proposed Motion upon his return from vacation.

65. On July 10, 2014, the Village Trustees held a Village Board meeting. Rather than discussing the Proposed Plan or Durand's Proposed Motion, the Village Trustees convened in closed session to allegedly confer with Village Attorney Cole regarding potential litigation. At the conclusion of the closed session, Trustee Miller made a motion to direct Village Attorney Cole to take necessary legal action. As a result of Miller's motion, and despite the Village Trustees' knowledge of the financing consequences for BE Meats that would result from a negative motion toward BE Meats, the Village Trustees unanimously passed a Resolution authorizing Village Attorney Cole "to pursue legal action against Black Earth Meats to remove the nuisance and any complaints" (the "Second Resolution").

66. At no time prior to the passage of the Second Resolution did the Village Trustees consider, nor render a decision, with respect to any of the four options under the Proposed Plan, or consider Durand's Proposed Motion. The Village Trustees' failure to address or issue a decision with respect to any option in the Proposed Plan constitutes an implicit denial of the

Proposed Plan, a complete lack of good faith, and ultimately accomplishes the desired goal of forcing BE Meats out of the Village.

67.    As Durand had indicated to the Village Trustees at the July 2, 2014 Village Board meeting, the Bank of New Glarus inquired as to the outcome of Durand's Proposed Motion to continue slaughter. Durand informed the Bank of New Glarus that the Village Trustees had unanimously denied his Motion and had unanimously passed the Second Resolution to pursue legal action against BE Meats.

68.    As a direct result of the denial of Durand's Proposed Motion and the passage of the Second Resolution, the USDA RD was unable to issue the Guarantee for the Loan. As such, the Bank of New Glarus informed Durand, by e-mail, that given "the pending legal action from the Village of Black Earth," the Bank of New Glarus could not extend the Loan. A copy of the e-mail is attached as Exhibit I.

69.    Under Wisconsin law, the Village of Black Earth has engaged in an unlawful taking of Durand's property. A taking need not arise from the actual physical occupation of land by the government. If a regulatory restriction or action of the government, (which among other things, would include the unanimous decision of the Village Trustees to direct Attorney Cole to instigate litigation at the July 10, 2014 meeting and deny Durand's Proposed Motion), deprives a property owner of all economically beneficial use of his property, there is a categorical regulatory taking subject to compensation. This has been interpreted by Wisconsin Courts to include regulatory actions that deny the landowner all or substantially all practical uses of the property.

70.    The actions of the Village Trustees amount to a regulatory taking as such actions deprive Durand of all or substantially all practical uses of the Property, especially in light of the

fact that the Property has been used as a slaughter facility for 60 years and there remains no other practical and economically viable use for the building.

71.     Given the Village Trustees' First and Second Resolutions deeming the slaughtering business to be a public nuisance, the slaughtering capability of the business can no longer be considered in extending financing.  As such, the building located on the Property now serves as the only collateral to secure an existing loan, which is also personally guaranteed by Durand and his family members.  The appraised value of the building is insufficient collateral to extend financing to continue the slaughter business and, therefore, BE Meats and Durand have no means to obtain the necessary financing to do so.

72.     Absent adequate financing to continue its operations, the BE Meats' slaughter business at the Property closed and the equipment was auctioned off to a buyer in Viroqua. BE Meats intends to cease the ancillary operations and shut down the facility once it sells the remaining perishable inventory in its possession.  Without the ability to slaughter, the ancillary retail operation must close.

73.     BE Meats and Durand provided proper notice of claims pursuant to § 893.80 for the matters alleged against the Village and the Village Trustees.  The claims were denied in full by the Village and the Village Trustees on January 7, 2014, and such claims form the basis of the present dispute.  A Complaint, Amended Complaint, Second Amended Complaint, and this Third Amended Complaint have been filed timely and served timely.  True and correct copies of the Notice of Claim and Denial of Notice of Claim are attached hereto as Exhibits J and K, respectively.

## FIRST CAUSE OF ACTION – PETITION FOR INVERSE CONDEMNATION PURSUANT TO WIS. STAT. § 32.10

74.     Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-73 above, as though fully set forth herein.

75.     BE Meats owns the Property and its use of the Property as a slaughterhouse is a permissible or legal, non-conforming legal use under the applicable zoning codes.

76.     BE Meats and Durand have a legitimate claim of entitlement to the Property and its continued use as a slaughterhouse.

77.     BE Meats' and Durand's use of the Property was so active and actual that BE Meats, as the Property owner, acquired a vested interest in the continuance of slaughter, which vested interest existed prior to the Village and Village Trustees' restrictions or regulations on the Property.

78.     BE Meats and Durand have a constitutionally protected and fundamental interest in the vested interest in slaughter, as well as their physical Property, the going concern value of the business located on the Property, the goodwill of the business located on the Property, the contractual agreements entered into between BE Meats and Durand and the Bank of New Glarus and the USDA RD, the contractual agreements entered into between BE Meats and Durand and the third-parties to slaughter and process a number of animals, and the contractual agreements entered into between BE Meats and Durand and the third-parties to purchase and update existing machinery and equipment ("Property Interest").

79.     At the December 10, 2013 meeting, the Village, by unanimous vote of the Village Trustees, passed the First Resolution determining that the slaughtering operation constituted a public nuisance, ordering BE Meats and Durand to discontinue their slaughter business use of the

Property, and giving BE Meats and Durand 120 days to provide the Village with a plan to relocate its slaughter business elsewhere.

80.     Durand obtained a ninety (90) day extension to that deadline and made the only efforts to retain, and pay for, services provided by EDP in order to present viable solutions to the alleged issues posed by the slaughtering operation.  The Village Trustees did not address, nor consider, any of the options presented under the Proposed Plan, and without rationale, implicitly denied the same.

81.     On July 10, 2014, the Village Trustees held a meeting in closed session with the Village Attorney, William Cole, to discuss potential litigation.  The Village Trustees reaffirmed their prior unanimous decision that the slaughtering operation constituted a public nuisance and denied Durand's Proposed Motion to permit the continuation of slaughter.  In lieu of approving Durand's Proposed Motion to permit slaughter, and despite the Village Trustees' awareness of the financing consequences for BE Meats resulting from their decision, the Village Trustees unanimously approved the Second Resolution authorizing Attorney William Cole to pursue legal action against BE Meats to remove the public nuisance and Complaints.

82.     When rendering their decision, the Village Trustees were keenly aware that BE Meats would lose the necessary financing for the BE Meats' business absent the Village's permission to continue the slaughter business, as Durand informed the Village Trustees of this fact on numerous occasions.  The Village Trustees were further aware that the loss of financing would result in significant damage to the BE Meats' business up to, and including, closure of the business.  On July 2, 2014, Durand specifically informed the Village Trustees that they had reached the "catastrophic phase" because the entire business was built on slaughtering.  As such, removing the slaughtering capability essentially removed the business.  In turn, without the

slaughtering capability, and as Durand had informed the Village Trustees, he could simply not obtain the financing to continue the business.

83.     Durand subsequently informed the Bank of New Glarus regarding the Village Trustees' unanimous denial of his Motion to continue to slaughter and their unanimous approval of the Second Resolution to pursue legal action and, as a direct result, the USDA RD was unable to issue the Guarantee for the Loan.  In turn, the Bank of New Glarus would not extend financing for the BE Meats' business, as evidenced in the e-mail correspondence attached as Exhibit I.

84.     Absent the availability of adequate financing, BE Meats ceased slaughter operations, sold its equipment, and is in the process of shutting down the business.

85.     A taking need not arise from the actual physical occupation of land by the government.  If a regulatory restriction or action of the government deprives a property owner of all economically beneficial use of his property, there is a categorical regulatory taking subject to compensation.  This has been interpreted by Wisconsin Courts to include regulatory actions that deny the landowner all or substantially all practical uses of the property.

86.     By objecting to the future use of the Property as a slaughterhouse, deeming the slaughtering operation to be a public nuisance, and directing Attorney William Cole to pursue legal action against BE Meats by passing the First and Second Resolutions, the Village and the Village Trustees deprived BE Meats and Durand of their Property Interest and destroyed all, or nearly all, economically beneficial use of the Property.

87.     The Village and Village Trustees deprived BE Meats and Durand of their Property Interest and destroyed all, or nearly all, economically beneficial use of the Property, without initiating condemnation proceedings, despite the Village and Village Trustees' power to do so.

88. The Village and Village Trustees deprived BE Meats and Durand of their Property Interest and destroyed all, or nearly all, economically beneficial use of the Property for alleged public benefit.

89. There was no justifiable public interest advanced in support of the deprivation of the Property Interest and the restraint on the use of the Property, including any allegation that BE Meats was a nuisance, because the legitimate slaughter business did not constitute a public nuisance as determined by the Court in the Order and Decision attached as Exhibit D.

90. The Village Trustees passage of the First and Second Resolutions constituted a restriction or regulation that was excessive and not reasonably necessary. Even a determination that BE Meats was a nuisance required the Village and Village Trustees to follow of specific mitigating procedures proscribed by ordinance and/or statute, which were not followed by the Village and Village Trustees in this instance.

91. Ultimately, the Village Trustees' decisions were unduly oppressive upon BE Meats and Durand.

92. The Village Trustees' unanimous decision at the December 10, 2013 Board meeting that the slaughtering operation constituted a public nuisance and resulting order for BE Meats and Durand to discontinue their slaughter business use of the Property, and the Village Trustees' unanimous reaffirmation of that decision at the July 10, 2014 meeting in closed session with the Village Attorney, whereby the Village Trustees denied Durand's Motion to permit the continuation of slaughter and authorized the Village Attorney to pursue legal action against BE Meats to remove the public nuisance and complaints, constituted a final decision by a government agency attempting to apply restrictions or regulations to the Property at issue.

93. In light of the Village and Village Trustees' chosen procedure for restricting and regulating slaughter through the guise of alleged nuisance law, there were no additional remedies

available to BE Meats or Durand before pursuing this action. In particular, administrative remedies, such as an administrative appeal, were unavailable to BE Meats and Durand since there was no procedure for appealing the passage of the First and Second Resolutions.

94.     Given that BE Meats must now close its operations, the buildings, fixtures and much of the equipment on the Property will lose substantially all of its value, resulting in a loss of approximately $1.3 million based on the recently appraised value of such items. In addition, a bona fide purchaser willing to purchase the Property and business for $6.0 million dollars has been lost. There are currently no other bona fide purchasers, nor is bona fide purchaser likely to come forward.

95.     Durand will likely be unable to sell the building in its present format. The building in its current state is designed for the single purpose of slaughtering. In light of the Village and Village Trustees' First and Second Resolutions prohibiting slaughter, any other intended use of the Property will require substantial financial contributions, including, but not limited to, removal of the slaughter fixtures and re-designing the building for any non-slaughter purpose.

96.     To date, the Village and the Village Trustees have failed to provide compensation to BE Meats and Durand for their order to relocate the slaughter business.

97.     Zero compensation ($0) is not just in these circumstances.

98.     The acts, conduct, and behavior of the Village and the unanimous votes of the Village Trustees were performed knowingly, intentionally, and maliciously to deprive BE Meats and Durand of their rights under the Wisconsin Constitution.

99.     The conduct of the Village and the Village Trustees deprived BE Meats and Durand of the rights secured to Plaintiffs by the Wisconsin Constitution pursuant to Article I, Section 13, which mandates that the property of no person shall be taken for public use without

just compensation therefor, and since this is the basis for Wis. Stat. § 32.10, which is the legislative direction as to how the mandate of the just compensation clause is to be fulfilled, BE Meats and Durand may pursue the remedies afforded pursuant to Wis. Stat. § 32.10.

100.     BE Meats and Durand ask that condemnation proceedings be commenced and claim damages in the form of property loss, and other harm caused by the Village and Village Trustees' acts.

## SECOND CAUSE OF ACTION - TAKINGS WITHOUT JUST COMPENSATION IN VIOLATION OF ARTICLE I, SECTION 13, OF THE WISCONSIN CONSTITUTION

101.     Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-100 above, as though fully set forth herein.

102.     To the extent Wis. Stat. § 32.10 is held not to govern the present circumstances, including any determination that the Village and Village Trustees' taking of BE Meats and Durand's Property Interest was a temporary taking for public use, a takings claim may be brought under the Wisconsin Constitution.

103.     The conduct of the Village and the Village Trustees deprived BE Meats and Durand of the rights secured to Plaintiffs by the Wisconsin Constitution pursuant to Article I, Section 13, which mandates that the property of no person shall be taken for public use without just compensation therefor, and BE Meats and Durand have sustained damages in the form of property loss, and other harm caused by the Village and Village Trustees' acts.

## THIRD CAUSE OF ACTION – VIOLATION OF RIGHTS PURSUANT TO 42 U.S.C § 1983

104.     Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-103 above, as though fully set forth herein.

105.     BE Meats owns the Property and its use of the Property as a slaughterhouse is a permissible or legal, non-conforming legal use under the applicable zoning codes.

106.    BE Meats and Durand have a legitimate claim of entitlement to the Property and its continued use as a slaughterhouse.

107.    BE Meats and Durand further earn a livelihood by operating the slaughter business.

108.    BE Meats and Durand have a constitutionally protected and fundamental Property Interest.

109.    The Village Board Meeting scheduled for December 10, 2013 to discuss BE Meats' and Durand's use of the Property was to be open to the public, pursuant to Black Earth Village Ordinance §§ 90-10A and Wis. Stat. § 61.32.

110.    The Village and the Village Trustees ultimately publicized the meeting scheduled for December 10, 2013.

111.    The Village did not provide notice of the December 10, 2013 meeting in a form that was reasonably likely to apprise members of the public. Based upon information and belief, many members of the public were not apprised of the time, date, place, and subject matter of the meeting; therefore, the Village's notice of the Meeting was improperly given pursuant to Wisconsin Statutes § 19.84.

112.    Once the December 10, 2013 meeting was in session, BE Meats and Durand also did not receive an orderly proceeding, a sufficient opportunity to defend or respond to the allegations made, nor a meaningful opportunity to be heard regarding the proposed deprivation of their Property Interest; BE Meats and Durand did not receive a fair and impartial hearing.

113.    At the December 10, 2013 meeting, the Village, by unanimous vote of the Village Trustees, determined that the slaughtering operation constituted a public nuisance, ordered BE Meats and Durand to discontinue their slaughter business use of the Property, and gave

BE Meats and Durand 120 days to provide the Village with a plan to relocate its slaughter business elsewhere.

114.    Durand obtained a ninety (90) day extension to that deadline and made the only efforts to retain, and pay for, services provided by EDP in order to present viable solutions to the alleged issues posed by the slaughtering operation.  The Village Trustees did not address nor consider any of the options presented under the Proposed Plan, and without rationale, implicitly denied the same.

115.    On July 10, 2014, the Village Trustees held a meeting in closed session with the Village Attorney, William Cole, to discuss potential litigation.  The Village Trustees reaffirmed their prior unanimous decision that the slaughtering operation constituted a public nuisance by denying Durand's Motion to permit the continuation of slaughter.  In lieu of approving the Motion to permit slaughter, and despite the Village Trustees' awareness of the financing consequences for BE Meats resulting from their decision, the Village Trustees unanimously approved the Second Resolution authorizing Attorney William Cole to pursue legal action against BE Meats to remove the public nuisance and complaints.

116.    When rendering their decision, the Village Trustees were keenly aware that BE Meats would lose the necessary financing for the BE Meats business absent the Village's permission to continue the slaughter business, as Durand informed the Village Trustees of this fact on numerous occasions.  The Village Trustees were further aware that the loss of financing would result in significant damage to the BE Meats' business up to, and including, closure of the business.  On July 2, 2014, Durand specifically informed the Village Trustees that they had reached the "catastrophic phase" because the entire business was built on slaughtering.  As such, removing the slaughtering capability essentially removed the business.  In turn, without the

slaughtering capability, and as Durand had informed the Village Trustees, he could simply not obtain the financing to continue the business.

117.     Since the July 10, 2014 meeting was held in closed session, BE Meats and Durand were unable to attend the meeting and to address the continued deprivation of their Property Interest and, as a result, did not receive an orderly proceeding, a sufficient opportunity to defend or respond to the allegations made, nor a meaningful opportunity to be heard; BE Meats and Durand again did not receive a fair and impartial hearing.  BE Meats and Durand were merely informed of the decisions rendered at the July 10, 2014 meeting after the decisions had been made.

118.     Durand subsequently informed the Bank of New Glarus regarding the Village Trustees' unanimous denial of his Motion to continue to slaughter and their unanimous approval of the Second Resolution to pursue legal action and, as a direct result, the USDA RD was unable to issue the Guarantee for the Loan.  In turn, the Bank of New Glarus would not extend financing for the BE Meats' business, as evidenced in the e-mail correspondence attached as Exhibit H.

119.     Absent the availability of adequate financing, BE Meats ceased slaughter operations, sold its equipment and is in the process of shutting down the business.

120.     By objecting to the future use of the Property as a slaughterhouse, deeming the slaughtering operation to be a public nuisance, and directing Attorney William Cole to pursue legal action against BE Meats, the Village and the Village Trustees deprived BE Meats and Durand of their Property Interest and destroyed all, or nearly all economically beneficial use of the Property.

121.     The Village and Village Trustees rendered a unanimous decision that was arbitrary, oppressive, and unreasonable, as the legitimate slaughter business did not constitute a public nuisance.

122.     The Village and Village Trustees' unanimous decision did not serve a legitimate governmental objective nor a compelling governmental interest and represented an act of ill will instead of judgment based on law. The Village and Village Trustees' decision was also not narrowly tailored to achieve any alleged interest on behalf of the Village.

123.     A taking need not arise from the actual physical occupation of land by the government. If a regulatory restriction, or action of the government, deprives a property owner of all economically beneficial use of his property, there is a categorical regulatory taking subject to compensation. This has been interpreted by Wisconsin Courts to include regulatory actions that deny the landowner all or substantially all practical uses of the property.

124.     The Village and the Village Trustees have further deprived BE Meats and Durand of the procedural and substantive due process to which they were entitled before being deprived of their Property Interest.

125.     Given that BE Meats must now close its operations, the buildings, fixtures and much of the equipment on the Property will lose substantially all of its value, resulting in a loss of approximately $1.3 million based on the recently appraised value of such items. In addition, a bona fide purchaser willing to purchase the Property and business for $6.0 million dollars has been lost. There are currently no other bona fide purchasers nor is bona fide purchaser likely to come forward.

126.     Durand will likely be unable to sell the building in its present format. Moreover, the Village of Black Earth is blighted with empty buildings that cannot be sold.

127.     To date, the Village and the Village Trustees have failed to provide compensation to BE Meats and Durand for their order to relocate the slaughter business.

128. The conduct of the Village and the Village Trustees deprived BE Meats and Durand of the following rights, privileges, and immunities secured to Plaintiffs by the Federal Constitution, and laws, pursuant to 42 U.S.C § 1983:

a. The right of Plaintiffs to not be deprived of life, liberty, or property without due process of law, secured by the 14th Amendment to the Constitution of the United States;

b. The right of Plaintiffs to equal protection of the laws, secured by the 14th Amendment to the Constitution of the United States; and

c. The right of Plaintiffs to just compensation for a taking of property, secured by the 5th Amendment to the Constitution of the United States.

129. The acts, conduct, and behavior of the Village and the unanimous votes of the Village Trustees were performed knowingly, intentionally, and maliciously to deprive BE Meats and Durand of their rights under the Constitution of the United States.

130. By reason of the conduct of the Village and the Village Trustees, including the deprivation of procedural and substantive due process, the denial of equal protection under the laws, and the taking of property without just compensation, BE Meats and Durand have sustained damages in the form of lost profits, damage to reputation, loss of goodwill, and other harm caused by the Village and Village Trustees' acts.

**FOURTH CAUSE OF ACTION – TORTIOUS INTERFERENCE**

131. Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-130 above, as though fully set forth herein.

132. BE Meats and Durand entered into a contract with a third party to slaughter and process a growing number of animals each week at a sum certain per head (gross profit).

133.    As a direct result of the Complaints, Citations, First and Second Resolutions, and Statements, the third party specifically questioned the reliability of BE Meats and decided not to proceed with the contract to slaughter and process a growing number of animals each week.

134.    By virtue of directing the issuance of the Citations, declaring the First and Second Resolutions, and making the Statements, the Village Trustees interfered, without justification or privilege, with BE Meats' and Durand's relationship with the third-party.

135.    Since the Citations lacked a basis in law and fact, the First and Second Resolutions were unconstitutional, the Statements were false, libelous and slanderous, and the Village Trustees' interference was improper.

136.    The Village Trustees were further aware, in advance, of the negative affects the Citations, First and Second Resolutions, and Statements would have on BE Meats' contract with the third party, as Durand discussed with the Village Trustees on numerous occasions the decreases in business as a result of the heightened concern with respect to BE Meats.

137.    The Village Trustees' interference with BE Meats' and Durand's contractual relationship with the third party was, therefore, intentional, malicious and willful.

138.    The Village Trustees' interference ultimately caused damages to BE Meats and Durand, including, but not limited to, irreparable damage to BE Meats' reputation as a reliable business partner with such third party and loss of goodwill.

139.    BE Meats and Durand also entered into several other contracts with other third parties to purchase additional machinery and equipment, and update existing machinery and equipment used in the course of the business.

140.    As a direct result of the Complaints, Citations, First and Second Resolutions, and Statements, BE Meats had to delay in the purchase of additional machinery and equipment, and

had to postpone the updating of the existing machinery and equipment thereby further impacting productivity and resulting in lost profits.

141.    By virtue of directing the issuance of the Citations, declaring the First and Second Resolutions, and making the Statements, the Village Trustees again interfered, without justification or privilege, with BE Meats' and Durand's relationship with the third parties.

142.    Since the Citations lacked a basis in law and fact, the First and Second Resolutions were unconstitutional, the Statements were false and defamatory, and the Village Trustees' interference was again improper.

143.    The Village Trustees were again aware, in advance, of the negative effects that the Citations, First and Second Resolutions, and Statements would have on BE Meats' contracts with the third parties, as Durand discussed with the Village Trustees on numerous occasions the decreases in business as a result of the heightened concern with respect to BE Meats.

144.    The Village Trustees' interference with BE Meats' and Durand's contractual relationship with the third parties was, therefore, intentional, malicious and willful.

145.    The Village Trustees' interference ultimately caused damages to BE Meats and Durand including, but not limited to, loss of revenue and delay in plans to expand their retail business into another community.

146.    The United States Department of Agriculture Rural Development agreed to enter into a contract to guarantee the Loan to be issued by the Bank of New Glarus for BE Meats and Durand in the amount of $1.3 million for a term of 15 years with a 5.99% annual interest rate. The USDA RD issued the Conditional Commitment to the Bank of New Glarus assuring the same, and the Bank of New Glarus agreed to extend the Loan to BE Meats and Durand in January 2014.

147.　As a direct result of the Complaints, Citations, First and Second Resolutions, and Statements, the USDA RD declined to enter into the contract to guarantee the Loan.  In turn, the Bank of New Glarus declined to extend the Loan, as evidenced by Exhibit I.

148.　By virtue of directing the issuance of the Citations, declaring the First and Second Resolutions, and making the Statements, the Village Trustees interfered, without justification or privilege, with BE Meats' and Durand's relationship with the USDA RD and the Bank of New Glarus.

149.　Since the Citations lacked a basis in law and fact, the First and Second Resolutions were unconstitutional, the Statements were false and defamatory, and the Village Trustees' interference was improper.

150.　The Village Trustees were aware of the existence of the Loan and Commitment, as it was discussed with the Village Trustees on numerous occasions.  The Village Trustees were further aware, as Durand informed them at the July 2, 2014 Village Board meeting, that if the Village Trustees did not work with Durand on one of the four options presented in the Proposed Plan, and allow the continuation of slaughter for the time being until the parties were able to carry out one of the four options in the Proposed Plan, the USDA RD would be unable to issue the Guarantee and the Bank of New Glarus would then be unable to extend the Loan.

151.　At the July 2, 2014 Village Board Meeting, Durand presented a Motion to permit continuation of slaughter and to declare that the slaughter business was not a public nuisance for that purpose.  Despite the Village Trustees' knowledge of the consequences of their decision, they unanimously declined Durand's Motion on July 10, 2014.

152.　The Village Trustees' interference with BE Meats' and Durand's contractual relationship the USDA RD and the Bank of New Glarus was, therefore, intentional, malicious and willful.

153. The Loan was necessary to fund, among other things, the mortgage on the Property, and equipment purchases and operating expenses for the BE Meats' business.

154. The Village Trustees' interference with BE Meats' and Durand's contractual relationship with the USDA RD and the Bank of New Glarus, therefore, caused damages to BE Meats and Durand, including, but not limited to, irreparable damage to, disintegration of the BE Meats business to the point at which it was unable to secure the necessary financing to continue its operations beyond approximately August 5, 2014.

155. The Village Trustees have tortuously interfered with existing and prospective business contracts and relations of BE Meats and Durand, and are liable to BE Meats and Durand for the resulting lost profits, damage to reputation, loss of goodwill and other harm caused by their acts.

## FIFTH CAUSE OF ACTION – MALICIOUS PROSECUTION

156. Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-155 above, as though fully set forth herein.

157. At Village Board meetings and Village Committee meetings, on numerous occasions, Trustee Frey and President Troge discussed with the other Village Trustees the alleged concerns raised by the Complaining Individuals as they related to the BE Meats operation.

158. As a result of the Complaints, at one of the Village Board meetings, Trustee Frey made a statement to the effect that he had to do something to get BE Meats out of town. Trustee Frey partially admitted making this statement at the Municipal Court hearing.

159. At the Village Board meeting held on July 10, 2013, the Village Trustees discussed at length the creation of an ordinance that would only affect BE Meats because of the difficulty of applying and enforcing existing ordinances with respect to the BE Meats' operation.

The Village Trustees also noted that, in drafting an ordinance that would impact BE Meats, it was important to make sure the newly drafted ordinance would not impact other local businesses. All of the foregoing communications have been transcribed and attached as Exhibit A.

160.     Upon information and belief, Trustee Frey and President Troge singled out BE Meats for selective prosecution of the Village Ordinances and for selective prosecution of the anticipated, newly drafted ordinance, of which the remaining Village Trustees, in carrying out this motive, unanimously approved.

161.     Enforcement of the Village ordinances constituted malice on the part of the Village Trustees.

162.     To date, no other business in the Village of Black Earth has been subjected to the same treatment for blocking state highways and side streets as BE Meats.  No citations have been issued to those businesses.

163.      President Troge further instructed the Contract Deputies to enforce Village ordinances by changing the work shifts of the Contract Deputies so that they would be available to issue municipal citations for violations by BE Meats and Durand.

164.     Trustee Frey's, President Troge's, and the remaining Village Trustees' instructions lead law enforcement officers to issue the numerous Citations, copies of which are attached as Exhibit C.

165.     The law enforcement officers were unsure how to cite BE Meats, lacked probable cause to issue the Citations, and acted beyond the scope of their discretion by issuing the Citations.

166.     A municipal hearing was held on April 21, 2014 and April 22, 2014 on the eleven Citations.  BE Meats was found guilty of all but two of the Citations.  BE Meats intentionally did not put on a defense to the Citations at the municipal court level.  The municipal court decision

was appealed by both parties to the Circuit Court. The Circuit Court granted BE Meats' Motion for Summary Judgment on October 10, 2014 declaring that "[t]he repeated issuance of citations by the [Village] against [BE Meats], seeking to have their business activities found to be a nuisance and to abate the longstanding agricultural use of their property is contrary to Wisconsin's Right to Farm law, whereas said business operations do not present a significant threat to the public health and or safety." Since there was no significant threat to the public health or safety, BE Meats was found not to be a nuisance and all of the Citations were dismissed, as evidenced by the copy of the Decision and Order attached as Exhibit D.

167. Trustee Frey, President Troge, and the remaining Village Trustees, have intentionally and willfully engaged in malicious prosecution, and are liable to BE Meats and Durand for damages sustained by the former proceedings including fines, if any, costs, disbursements, attorneys' fees, and the resulting lost profits, damage to reputation, loss of goodwill and other harm caused by the Village Trustees' acts.

## SIXTH CAUSE OF ACTION – ABUSE OF PROCESS

168. Plaintiffs reallege and incorporate the allegations contained in paragraphs 1-167 above, as though fully set forth herein.

169. Trustee Frey and President Troge's instructions to the Contract Deputies to enforce the ordinances and issue citations for violations by BE Meats and Durand served the intended purpose of singling out BE Meats in an effort to drive the business out of town.

170. The remaining Village Trustees, in unanimously consenting to such action, participated in carrying out this purpose.

171. The stated purpose of forcing a business to relocate, as a basis for enforcement of the ordinances, is not a purpose for which the legal process may serve.

172.    The Village Trustees' selective enforcement and prosecution of the alleged ordinance violations was a malicious, willful, and intentional misuse of the legal process to obtain an ulterior advantage; the violations could not be properly sustained.

173.    Trustee Frey, President Troge and the remaining Village Trustees have engaged in abuse of process, and are liable to BE Meats and Durand for damages sustained by the former proceedings including fines, if any, costs, disbursements, attorneys' fees, and the resulting lost profits, damage to reputation, loss of goodwill and other harm caused by the Village Trustees' acts.

**WHEREFORE**, Plaintiffs Black Earth Meat Market, LLC and Kemper Bartlett Durand, Jr., respectfully request that the Court enter judgment against Defendants Village of Black Earth, Patrick Troge, Patrick Frey, Ted Pritchett, Thomas Parrell, James Coyle, Beth Marty, and Walt Miller, jointly and severally, as follows:

1.  Declaratory and/or injunctive relief as follows:

    a.  A declaration that the Village and its Officers and agents, including Village Trustees, cannot and are permanently enjoined from enforcing the First and Second Resolutions;

    b.  A declaration that BE Meats' use of the Property continues to be a permissible non-conforming use;

    c.  A declaration that BE Meats' use of the Property does not constitute a public or private nuisance; and

    d.  A declaration that the Citations were improperly issued, and are revoked with any amounts paid by BE Meats pursuant to the Citations to be refunded by the payee.

2. Damages sustained as a result of Defendants' conduct to date, including, but not limited to, loss of goodwill, revenue, and regulatory taking of the Property without just compensation, in an amount equal to or exceeding $6,840,200.00 million dollars;

3. Punitive Damages for all claims, as allowed by law;

4. Attorney's fees pursuant to 42 U.S.C. 1988(b);

5. Litigation expenses under Wis. Stat. § 32.10;

6. All costs and disbursements, as allowed by law; and

7. For such other and further relief as the Court deems just and equitable.

**PLAINTIFFS REQUEST A JURY OF SEVEN IN ACCORDANCE WITH THE PRELIMINARY PRETRIAL CONFERENCE ORDER**

Dated this 16th day of June, 2015.

FUHRMAN & DODGE, S.C.

/s/ Brittany A. Wilson
Todd M. Pfeil, State Bar No. 1020200
Christopher J. Dodge, State Bar No. 1011530
Brittany A. Wilson, State Bar No. 1087927
*Attorneys for Plaintiffs, Black Earth Meat*
*Market, LLC and Kemper Bartlett Durand, Jr.*

Address:
Fuhrman & Dodge, S.C.
2009 W. Beltline Hwy., Suite 102
Madison, WI 53713
Ph: 608-327-4204
Fax: 608-327-4206
Email: tpfeil@fuhrmandodge.com
        cdodge@fuhrmandodge.com
        bwilson@fuhrmandodge.com


Co-Counsel: (Motion *Pro Hac Vice* Pending)

Miller Schirger, LLC
Stephen R. Miller
Fredrick J. Ernst
4520 Main Street
Suite 1570
Kansas City, MO 64111
(816) 561-6500