IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BLACK EARTH MEAT MARKET, LLC and       OPINION and ORDER
KEMPER BARTLETT DURAND, JR.,

                                    14-cv-674-bbc

                Plaintiffs,

     v.

VILLAGE OF BLACK EARTH, PATRICK
TROGE, PATRICK FREY, TED PRITCHETT,
THOMAS PARRELL, JAMES COYLE, BETH
MARTY and WALT MILLER,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This case arises out of a dispute over the operation of a slaughterhouse in the Village of Black Earth, Wisconsin. Plaintiffs Kemper Bartlett Durand, Jr. and Black Earth Meat Market, LLC, contend that the way in which defendants Village of Black Earth, Patrick Troge, Patrick Frey, Ted Pritchett, Thomas Parrell, James Coyle, Beth Marty and Walt Miller regulated plaintiffs' slaughterhouse operation violated plaintiffs' rights under the takings clause, the equal protection clause and the due process clause of the United States Constitution. Specifically, plaintiffs contend that defendants effected a taking of their business and violated their constitutional rights by directing plaintiffs to develop a plan for relocating their slaughterhouse, enforcing municipal ordinances in an unfair manner and threatening legal action to enjoin plaintiff's slaughter operation. Plaintiffs also assert various state law claims, including claims for inverse condemnation, violations of Wisconsin's state

constitution, tortious interference, malicious prosecution and abuse of process.

Plaintiffs filed this lawsuit in state court, but defendants removed it to this court pursuant to 28 U.S.C. § 1441 because plaintiffs' takings, equal protection and due process claims arise under federal law. The parties have since filed cross motions for summary judgment, which are fully briefed. Plaintiffs have also filed a motion to strike certain arguments from defendants' reply brief, or alternatively, for leave to file a sur-reply; defendants ask that I deny this motion, or alternatively, grant them leave to file a sur-sur-reply.

I will grant defendants' motion for summary judgment on each of the three constitutional claims plaintiffs have raised. First, plaintiffs have abandoned their federal takings claim, which would not be ripe in any event because they have not sought compensation through Wisconsin's inverse condemnation proceedings. Second, plaintiffs' "class of one" equal protection claim fails because they have not shown that they were treated differently from others similarly situated. Third, plaintiffs' due process claims fail because plaintiffs have failed to present sufficient evidence to support a finding that defendants deprived them of a protected interest.

Finally, I will deny plaintiffs' motion to strike and will also deny their motion for leave to file a sur-reply brief. Although defendants waited until filing their reply brief to oppose plaintiffs' arguments that defendants' threat of litigation deprived plaintiffs of a protected interest, their delay is attributable to plaintiffs' failure to clearly identify in their complaint (or in their own summary judgment briefing, for that matter) how defendants

deprived them of due process. In light of this ruling, defendants' request to file a sur-sur-reply is moot.

From the parties' proposed facts, I find that the following are relevant and not genuinely disputed.

UNDISPUTED FACTS

Plaintiff Black Earth Meat Market, LLC is a limited liability company organized under Wisconsin law; plaintiff Kemper Bartlett Durand, Jr. is its managing member, investor and registered agent. Defendant Village of Black Earth is a municipal corporation and subdivision of the state of Wisconsin. At all relevant times Defendants Patrick Troge, Patrick Frey, Ted Pritchett, Thomas Parrell, James Coyle, Beth Marty and Walt Miller have constituted the Village's board of trustees.

In 2001, Black Earth Meats purchased a parcel of land located at 1345 Mills Street in the Village of Black Earth, Wisconsin. At the time of the purchase, the real estate had been used for more than sixty years as a slaughterhouse and retail butcher shop, with the two facilities operating side-by-side for the entire time. Under the zoning ordinance in place when Black Earth Meats purchased the land, the parcel was zoned "B-1 General Commercial." As a general rule, such zoning does not allow for the operation of a slaughterhouse, but plaintiffs' slaughterhouse operation qualified as a "legal nonconforming use" because animals had been slaughtered at the facility before the applicable zoning ordinance was adopted.

Sometime after 2009, the volume and frequency of slaughter began to increase at the Black Earth Meats facility. In approximately 2011, Village residents living near the facility complained to the Village about the slaughterhouse operation. These complaints related to increased truck traffic to and from the facility, delivery trucks blocking the road, noise from livestock, foul odors, improper storage of animal parts, the presence of offal runoff and blood and animal waste on the streets. Moreover, on three occasions between 2009 and 2012, livestock escaped from the slaughterhouse and were found running through the Village. Each time, the animals had to be tracked down and shot by law enforcement.

In light of the residents' complaints, the Village retained a building inspection and land use consulting firm, Vierbicher and Associates, to prepare a report on the slaughter operation at Black Earth Meats and its nonconforming use status. The consultant's assessment was that Black Earth Meats could continue to slaughter animals, but could not expand the slaughter facility or its footprint. The report also noted that in addition to the zoning rules, Black Earth Meats may have violated certain local ordinances regulating nuisances and health and sanitation. The Village's trustees, law enforcement officers and attorneys spoke with Black Earth Meats, wrote it letters, and issued the company a number of warnings about these matters.

On July 10, 2013, the Village trustees met with the Village's attorney regarding the problems with Black Earth Meats and discussed both the ordinance violations and zoning issues related to the slaughter operation. The trustees discussed drafting or amending ordinances specifically for Black Earth Meats, but were concerned about taking such action

with respect to one specific business. However, the trustees did decide that the Village should do more to enforce certain ordinances that they suspected the company was violating. This decision was communicated to the city's law enforcement officials the following week at a Village Police Committee meeting. As a result of the Village's increased enforcement efforts, Black Earth Meats received nine citations between October 1, 2013 and January 3, 2014. Three of these citations were for obstructing the street outside the facility and idling unattended vehicles. Despite the citations, citizens continued to complain about the slaughter operation; the Village received forty calls for police service related to Black Earth Meats in 2013 alone.

On December 10, 2013, the Village held a public meeting "regarding nuisance and zoning violations associated with Black Earth Meats." The meeting's agenda allotted time for comments regarding Black Earth Meats from law enforcement, the Village's building inspector, a Black Earth Meats representative and the public. The agenda also provided that after the public meeting and comment period, the trustees would discuss and vote on the "strategy to be adopted by the [Village] with respect to litigation in which it is or likely to become involved regarding Black Earth Meats." Notice of the meeting was published and plaintiff Durand spoke on behalf of Black Earth Meats.

At the conclusion of the December 10, 2013 meeting, the Village trustees passed a motion in which they agreed to give Black Earth Meats 120 days to present an acceptable plan for relocating the slaughter operation, adding that if such a plan were not presented within that time frame, the Village would "take legal action to remove the slaughter

5

operation." The following day, Village President Troge wrote to Black Earth Meats, explaining that the slaughter operation had "increased to such a degree that it is now a much more intensive commercial slaughtering operation" and had become a "nuisance." Troge directed Black Earth Meats to relocate within a reasonable period of time and warned it in the letter that if a plan for relocating the slaughter operation were not presented within 120 days, the Village "intend[ed] to commence legal action to abate the nuisance and secure a court order enjoining slaughter operations."

Black Earth Meats responded to Troge's letter by serving the Village a notice of claim dated December 23, 2013, alleging that "as a direct result of the Village's Complaints, Citations, Resolutions and Statements," the United States Department of Agriculture had refused to guarantee a loan that the Bank of New Glarus intended to provide the company. They added that, without the USDA guarantee, the Bank of New Glarus was "revisiting the terms of the Loan, including whether to lend to [Black Earth] Meats at all, or to issue a loan under stricter terms." Despite plaintiffs' notification that its actions might affect Black Earth Meats' financing, the Village denied the notice of claim on January 7, 2014.

Black Earth Meats was given an extension of time to present its plan for relocating the slaughter operation. On June 26, 2014, a meeting was held for the purpose of hearing the plan. Instead of offering a relocation plan, Black Earth Meats presented a report prepared by a consultant that outlined four options for mitigating the problems caused by the slaughter operation. Only one of these options was to relocate the slaughter operation to a new facility. The Village board did not take any action at that meeting.

One week later, the Village board held a regular meeting, at which plaintiff Durand appeared and discussed Black Earth Meats' financing problems resulting from the December 10, 2013 motion and the Village's interference with its slaughter operation. Durand told the board of his need for a loan in order to continue operating Black Earth Meats and explained that without an affirmative motion from the Village trustees authorizing slaughter, the loan would fall through. To address this issue and enable Black Earth Meats to obtain the necessary financing, Durand asked the Village trustees to act immediately to approve the motion he had previously submitted for consideration, which provided as follows:

> Motion: Slaughter is permitted at the Black Earth Meats facility under current zoning as a legal, non-conforming use. As such, the Board affirms that the slaughter shall be permitted to continue and that normal operation of the slaughter business is not a public nuisance.

Village President Troge told Durand that although he was not categorically against the proposed motion, the Village board could not vote on it until after it was reviewed by the Village's legal counsel. That same day plaintiffs filed this lawsuit in the Circuit Court for Dane County, Wisconsin.

The Village trustees reconvened the following week, held a public discussion regarding Black Earth Meats and then entered into a closed session for another discussion of "strategy to be adopted by the [Village] with respect to litigation in which it is or is likely to become involved." Durand was present at this meeting and given an opportunity to speak, but declined to make any comments. After the closed session, rather than adopt Durand's proposed motion, the Village trustees passed a motion "to authorize and direct the Village attorney to take necessary legal action to eliminate any public nuisance and complaints of

Black Earth Meats."

In light of this Village resolution, the Bank of New Glarus informed plaintiff Durand on July 21, 2014 that it would not be able to extend the previously agreed upon financing. The Bank of New Glarus did provide short term financing, but Black Earth Meats was unable to continue its slaughter operations. As of August 4, 2015, Black Earth Meats closed and the facility was listed for sale.

OPINION

In their third amended complaint, plaintiffs contend that defendants violated plaintiffs' constitutional rights under the takings clause, the equal protection clause and the due process clause. I will take up each of these contentions in order.

A. Claims Against the Individual Defendants

Before turning to the merits of plaintiffs' claims, I must address the capacity in which the seven Village trustees are being sued. Although plaintiffs do not state explicitly in their third amended complaint whether they are suing the trustees in their personal or their official capacities, they make it clear in their briefs that they are proceeding against these individuals only in their official capacities. Dkt. #105 at 4-5 ("Plaintiffs allege that the acts of the individual Village Trustees were done under the authority of their positions, and, as such, are being sued in their official capacity.").

Section 1983 claims against individuals in their official capacities are viewed as

nothing other than claims against the municipality.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.")  Therefore, I will dismiss plaintiffs' § 1983 claims against the seven trustees as redundant of plaintiffs' § 1983 claim against the Village.  <u>Veatch v. Bartels Lutheran Home</u>, 627 F.3d 1254, 1257 (8th Cir. 2010) ("A suit against a government officer in his official capacity is functionally equivalent to a suit against the employing governmental entity. Thus, the court properly dismissed the claim against Leonard as redundant of the claim against the City.").  The dismissal of all of plaintiffs' claims against the individual defendants moots defendants' qualified and absolute immunity arguments.  <u>Hernandez v. Sheahan</u>, 455 F.3d 772, 776 (7th Cir. 2006) ("[U]nits of government are not entitled to immunity in suits under Section 1983.").

B. <u>Takings</u>

Plaintiffs' third amended complaint includes a claim that defendants violated plaintiffs' Fifth Amendment right to "just compensation for [the] taking of [their] property."  However, only defendants have moved for summary judgment on this claim. In their brief, dkt. #105 at 21, plaintiffs say, "Notably, the Plaintiffs have not now moved the Court for summary judgment on any of their previously pled takings claims, nor are they required to continue the pursuit of these previously pled claims."  In other words, plaintiffs concede for purposes of summary judgment that they cannot state a § 1983 claim based on an alleged

violation of the takings clause.  Id. at 23 ("As a result of all Wisconsin and federal takings claims requiring a formal land-use regulation as the cause of the alleged harm, none of these claims are available remedies for the Plaintiffs to pursue.").  Accordingly, I will dismiss plaintiffs' federal takings claim without prejudice.

Even if plaintiffs had not abandoned their takings claim, I would still enter summary judgment in defendants' favor on the grounds that plaintiffs' takings claim is not ripe.  As defendants point out, under Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985), plaintiffs have not been denied "just compensation" until they have asked for it by filing an inverse condemnation action, which plaintiffs have not done.  Id. at 194-95 (1985) ("If the government has provided adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking.").

## C. Equal Protection

Next, plaintiffs allege that defendants violated their Fourteenth Amendment right to equal protection.  Plaintiffs do not argue that defendants discriminated against them because they are a member of an identifiable group.  Rather, plaintiffs are proceeding on a "class of one" theory which requires them to establish at least two things: (1) defendants have treated them differently from others similarly situated and have done so intentionally; and (2) defendants had no rational basis for the difference in treatment.  Fares Pawn, LLC v. Indiana Department of Financial Institutions, 755 F.3d 839, 845 (7th Cir. 2014).  It remains

unclear whether plaintiffs must also prove that defendants had a hostile or illegitimate motive for their conduct or decisions.  Id.  ("In Del Marcelle v. Brown County Corp., 680 F.3d 887 (7th Cir. 2012)(en banc), this court divided on [whether plaintiffs must prove animus], leaving no controlling opinion.").  However, this issue is irrelevant here.  Even without such a requirement, plaintiffs have failed to show that the Village acted without a reasonable basis.  Id. at 845 (if reviewing court can conceive of "a rational basis for the challenged action, that will be the end of the matter—animus or no.").

Plaintiffs begin by setting forth a five-page narrative of the "countless facts, all of which together depict the story of intentional mistreatment" by defendants.  This narrative may show that defendants attempted to regulate plaintiffs' conduct, but it does not explain how any of defendants' acts qualify as the type of "mistreatment" that would allow this court to find a violation of plaintiffs' right to equal protection.  Although plaintiffs are required to show that they were singled out "for reasons wholly unrelated to any legitimate state objective," Esmail v. Macrane, 53 F.3d 176, 179 (7th Cir. 1995), they have not provided any evidence that defendants acted with "sheer vindictiveness" or "malignant animosity" or that defendants' actions were arbitrary or irrational.  Id.; Fenje v. Feld, 398 F.3d 620, 628 (7th Cir. 2005).  Ultimately, as long as defendants acted for some legitimate governmental purpose, they could not be held to have violated plaintiffs' rights to equal protection.  D.B. ex rel. Kurtis B. v. Kopp, 725 F.3d 681, 686 (7th Cir. 2013)("The burden is on the challenger to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.") (citing Srail v. Village of Lisle, Ill., 588 F.3d 940, 946 (7th Cir.

2009))).

Plaintiffs point to the fact that Black Earth Meats received three ordinance violations for unattended and idling vehicles over a two-month period that another local business did not receive. Specifically, plaintiffs allege that, like Black Earth Meats, David W. Heiney's Dining & Spirits also received early morning deliveries from semi-trucks that blocked part of the roadway. This, however, proves next to nothing because plaintiffs have not shown that Heiney's was similarly situated to Black Earth Meats. To be similarly situated, a comparator must be "identical or directly comparable" to the plaintiff "in all material respects." Miller v. City of Monona, 784 F.3d 1113, 1120 (7th Cir. 2015) (citing LaBella Winnetka, Inc. v. Village of Winnetka, 628 F.3d 937, 942 (7th Cir. 2010)). The present record contains no evidence that the Village received repeated complaints related to Heiney's deliveries, whereas it contains ample evidence that there were differences in the timing, duration and manner of the two companies' deliveries. For example, unlike deliveries to Black Earth Meats, deliveries to Heiney's did not result in the blocking of the entire street outside the business. Finally, Heiney's was not even in business at the time Black Earth Meats received the traffic citations. Ultimately, the fact that one business did not receive citations for allegedly violating the Village's parking and idling ordinances and Black Earth Meats received three, does not establish that defendants lacked a legitimate reason for citing Black Earth Meats. Esmail, 53 F.3d at 179-80 (explaining why "simply failing to prosecute all known lawbreakers" does not support an equal protection claim).

Finally, plaintiffs argue that the Village "deviated from the norm" with respect to the

way it handled "nuisance-related" issues, but they have not established either that there was a "norm" for handling such issues or that the Village's deviation from this supposed norm lacked a rational basis. Plaintiffs identify "The Shack" (a local bar) and an apartment complex as comparators, because according to plaintiffs, they too were labeled nuisances, but were not scrutinized in the same way as Black Earth Meats. It is clear, however, that the nuisances associated with these two businesses were different from the nuisances associated with Black Earth Meats. For example, The Shack had drunk bar patrons getting in street fights; Black Earth Meats had escaped steers running through the Village trailed by armed Black Earth Meats employees. The apartment complex may have left trash out, but Black Earth Meats had animal waste, blood and offal spilling from trucks. To the extent defendants had a "norm" for dealing with nuisance-behavior, they had ample justification for deviating from it to deal with the unique issues presented by Black Earth Meats.

## D. Due Process

Finally, plaintiffs contend that defendants violated both their procedural and substantive due process rights under the Fourteenth Amendment. Substantive and procedural due process claims address distinct issues. Bettendorf v. St. Croix County, 631 F.3d 421, 426 (7th Cir. 2011). Substantive due process is implicated where a municipality's adverse decision is "arbitrary, oppressive, or unreasonable." Id. By contrast, procedural due process claims focus on the "form of the procedures that the government must afford an individual given the particularities of the situation." Id. In other words, substantive due

process claims attack the propriety of the decision itself; procedural due process claims attack the manner in which a decision was made.

1. Exhaustion of Wisconsin's inverse condemnation procedure

Before I consider the merits of plaintiffs' due process claims, I will address defendants' argument that summary judgment should be granted in their favor because plaintiffs have failed to satisfy the finality and exhaustion requirements set forth in Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985). Defendants argue that although Williamson County involved a takings claim, its holding applies to any "constitutional claims [that] arise in the context of a land use challenge." As a result, defendants argue, plaintiffs' due process claims are not ripe until they request relief under Wisconsin's inverse condemnation laws and are denied it.

Defendants have misinterpreted the Court of Appeals for the Seventh Circuit's opinions regarding the breadth of Williamson County's application. On a number of occasions, the court of appeals has held that "bona fide" equal protection claims based on a distinct set of facts separate from purported takings claims are not subject to Williamson County's finality and exhaustion requirements. Forseth v. Village of Sussex, 199 F.3d 363, 371 (7th Cir. 2000)("[T]his Circuit recognized in Hager v. City of Peoria [84 F.3d 865, 869-70 (7th Cir. 1996)] that *bona fide* equal protection claims arising from land-use decisions can be made independently from a takings claim and without being subject to Williamson ripeness."). This reasoning is equally applicable to bona fide due process claims regardless

whether the claims arise in the "land use context." Although there is language in <u>Forseth</u> and <u>Gamble v. Eau Claire County</u>, 5 F.3d 285 (7th Cir. 1993), that could be read as supporting defendants' broader interpretation, when those cases are properly construed they merely reiterate the common sense notion that *labels* are irrelevant, that is, <u>Williamson County</u>'s finality and exhaustion requirements apply to all takings claims, regardless how such claims are styled or labeled. Although plaintiffs' due process and takings claims overlap in some respects, the former is not merely the latter in disguise. Therefore, it is not necessary for plaintiffs to exhaust their procedural and substantive due process claims and I may consider their merits.

## 2. <u>Procedural due process</u>

Procedural due process claims require the plaintiff to establish both that (1) the defendant has deprived the plaintiff of a protected liberty or property interest; and (2) the defendant did not provide the plaintiff the process he was due. <u>Pro's Sports Bar & Grill v. City of Country Club Hills</u>, 589 F.3d 865, 870 (7th Cir. 2009).

## a. Plaintiffs' protected interests

The threshold question regarding plaintiffs' due process claims is whether plaintiffs were deprived of a protected "property" or "liberty" interest under the due process clause. <u>Solomon v. Elsea</u>, 676 F.2d 282, 284 (7th Cir. 1982)("It is axiomatic that before due process protections can apply, there must first exist a protectible liberty or property

interest."). Plaintiffs contend that they were deprived of five specific interests: (1) a liberty interest in the occupation of slaughter; (2) a property interest in a nonconforming use of their land; (3) an interest in the use of their property "for a slaughterhouse purpose"; (4) an interest in their "consumer goodwill"; and (5) an interest in their financing agreement.

Defendants do not deny that plaintiffs have a protected liberty interest in their occupation and a protected property interest in the preexisting nonconforming use of the facility. Therefore, I will assume for purposes of their summary judgment motions that these interests are protected. However, defendants do argue that plaintiffs' remaining interests—their use of their property "for a slaughterhouse purpose," their financing contract with New Glarus Bank and their consumer goodwill—are not similarly protected. To determine whether these interests are protected I must look to Wisconsin's property laws. General Auto Service Station v. City of Chicago, 526 F.3d 991, 1000 (7th Cir. 2008) ("For purposes of a due process claim, property interests are created and defined by an independent source, such as a contract or state law.").

I agree that plaintiffs have a protected right to use their property for a "slaughterhouse purpose." The use of the property for a slaughterhouse purpose, or for any other purpose, is a right that accompanies plaintiffs' ownership of the property. Ownership includes "the right of use—one of the bundle of rights attendant to ownership under the laws of property in all states." Polenz v. Parrott, 883 F.2d 551, 557 (7th Cir. 1989). Although this particular use may be one of the thinner sticks in plaintiffs' bundle, it is still protected. Otherwise, "state officials could with impunity destroy property rights in detail." Reed v.

Village of Shorewood, 704 F.2d 943, 949 (7th Cir. 1983).

Plaintiffs' contract with the Bank of New Glarus was also a form of property protected by due process. The Court of Appeals for the Seventh Circuit has held that, "[i]f a contract creates rights specific enough to be enforced in state court by awards of damages or specific performance, then it creates a legitimate claim of entitlement; and if it creates such a claim, it is 'property.'" Mid-American Waste Systems, Inc. v. City of Gary, Ind., 49 F.3d 286, 290 (7th Cir. 1995). Although the parties disagree about what rights and entitlements plaintiffs had under the financing contract, it is beyond dispute that the contract itself was a form of property under Wisconsin law and the due process clause.

However, plaintiffs' interest in their goodwill is not protected. The Supreme Court has long held that harm to a party's reputation is insufficient to trigger due process protections. Paul v. Davis, 424 U.S. 693 (1976). As important as a business's interest in its reputation may be, it is not a recognized property right. A party can hope it is held in high esteem by clients and colleagues, but it is not *entitled* to its lofty reputation.

b. Deprivation of plaintiffs' rights

Having identified the protected rights at issue, I can now turn to whether defendants have deprived plaintiffs of these rights. Plaintiffs' § 1983 claim requires that they establish "a direct causal link" between the Village's conduct and the deprivation of their protected rights. Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997). Plaintiffs have identified four actions that allegedly deprived them of their

protected interests without due process: (1) the December 10 motion; (2) the July 10 motion; (3) the December 11 letter; and (4) the failure to adopt plaintiff Durand's motion. Defendants deny that plaintiffs have established the requisite causal relationship between these actions and plaintiffs' loss of the aforementioned protected interests. I agree.

As an initial matter, none of the Village's actions deprived plaintiffs *directly* of any of the protected rights they identify. The December 10 motion and December 11 letter informed plaintiff that the Village intended to take legal action to "abate the nuisance and secure a court order enjoining the slaughter operations" if plaintiff did not present an acceptable plan for voluntarily relocating. Similarly, the July 10 motion directed the Village attorney to take necessary legal action to "eliminate any public nuisance and complaints of Black Earth Meats." Plaintiffs' characterization of these motions as "orders to cease slaughter" or "orders to relocate" is incorrect. The December 10 motion, the December 11 letter and the July 10 motion all made clear that if it became necessary to enjoin slaughter at Black Earth Meats or force the company to relocate, the Village intended to do so through the proper channel—the court system. The motions are actions by the Village trustees authorizing the Village's attorney to obtain orders to cease slaughter or relocate from a court. The law recognizes no constitutionally protected right to operate a business free from the threat of lawsuits by state officials. As the Court of Appeals for the Sixth Circuit has pointed out, "To demand notice before an official can inform citizens that they are in violation of the law would be to demand notice as a precondition of notice." Hussein v. City of Perrysburg, 617 F.3d 828, 832 (6th Cir. 2010).

Plaintiffs argue nevertheless that they can establish the requisite causal relationship. They contend that under the "eggshell skull" rule, the Village is forced to take Black Earth Meats as the Village found it—that is, in a precarious financial position and in need of a loan. According to plaintiffs, the Village deprived them of the liberty and property interests associated with Black Earth Meats' slaughter operation because the Village prevented them from obtaining the loan they needed to stay in business. In other words, by threatening to take legal action, the Village undermined plaintiffs' ability to obtain the financing they needed to operate. Without financing, plaintiffs had no choice but to close the business. By closing the business, they were deprived of their right to engage in slaughter, use their land "for a slaughterhouse purpose" and benefit from Black Earth Meats' goodwill.

Plaintiffs' reliance on the "eggshell skull" rule is misguided and their "chain of events" theory is far too attenuated to support a claim. The Village's actions did not deprive plaintiffs of their protected liberty and property interests; Black Earth Meats' inability to obtain financing did. The mere fact that a state action ultimately leads to loss of a plaintiff's protected interest is not enough to establish a deprivation by state action in the constitutional sense. <u>Martinez v. State of California</u>, 444 U.S. 277, 284 (1980) (California statute conferring immunity on officials responsible for parole decisions merely condoned parole release that led directly to victim's death; it did not deprive victim of life without due process or of property even if cause of action for wrongful death could be considered form of property protected by due process clause). The fact that plaintiffs may have lost certain benefits or suffered certain harms as a result of the Village's actions does not mean that the

Village "deprived" plaintiffs of these rights.

Finally, plaintiffs cannot bridge the gap between the Village's conduct and the alleged loss of their liberty and property rights by invoking the eggshell skull rule. That rule allows a plaintiff to recover damages for remote harms attributable to a tortfeasor's wrongful acts, but it does not bear on whether the tortfeasor's acts were wrongful in the first place. Plaintiffs must *first* establish that defendants deprived them of their rights without due process, which requires them to establish a "direct causal link" between the Village's acts and the alleged deprivation. Board of County Commissioners of Bryan County, Oklahoma, 520 U.S. at 404. Only after they satisfy this threshold requirement are plaintiffs able to invoke the eggshell skull rule to recover for the remote harms associated with that deprivation. Restatement (Third) of Torts: Liability for Physical and Emotional Harms § 31 (2010) ("The [eggshell skull rule], which addresses the scope of liability when the extent of harm is unusual or greater than might be anticipated, must be distinguished from the requirement of factual cause, which limits an actor's liability to the injuries caused by the tortious conduct.").

3. Substantive due process

Substantive due process rights are "very limited" in their scope. Tun v. Whitticker, 398 F.3d 899, 902 (7th Cir. 2005). For a municipality to violate substantive due process, it must engage in conduct that "shocks the conscience," id., or must make a decision that is "random and irrational." General Auto Service Station, 526 F.3d at 1000. Here, the Village did neither. All it did was enforce its ordinances in a reasonable and rational manner,

authorize its counsel to take legal action to abate conduct that it believed was a nuisance and refuse to pass plaintiff Durand's proposed motion. None of these actions can be construed as "shocking"; all were rationally related to legitimate governmental interests.

### E. Plaintiff's State Law Claims

The general rule is that a district court should decline to exercise supplemental jurisdiction over state law claims when it has dismissed before trial all the claims over which it has original jurisdiction. Carr v. CIGNA Securities, Inc., 95 F.3d 544, 546 (7th Cir. 1996). Furthermore, although the district court can dismiss the supplemental state law claims, the preferred approach is to remand the claims to state court. Payne for Hicks v. Churchich, 161 F.3d 1030, 1043 (7th Cir. 1998) ("[T]he usual and preferred course is to remand the state claims to the state court unless there are countervailing considerations."). Plaintiffs have suggested no reason to deviate from the general rule or from the preferred approach in this instance. Accordingly, plaintiffs' state law claims will be remanded to state court.

### ORDER

IT IS ORDERED that

1. The motion for summary judgment filed by plaintiffs Kemper Bartlett Durand, Jr. and Black Earth Meat Market, LLC, dkt. #74, is DENIED. The motion for summary judgment filed by defendants Village of Black Earth, Patrick Troge, Patrick Frey, Ted

Pritchett, Thomas Parrell, James Coyle, Beth Marty and Walt Miller, dkt. #73, is GRANTED. Plaintiffs' motion to strike, or in the alternative, for leave to file a sur-reply, dkt. #117, is DENIED.

2.      Plaintiffs' § 1983 claims based on defendants' alleged violation of plaintiffs' rights under the Fourteenth Amendment's due process and equal protection clauses are DISMISSED WITH PREJUDICE. Plaintiffs' § 1983 claims based on defendants' alleged violation of plaintiffs' rights under the Fifth Amendment's takings clause are DISMISSED WITHOUT PREJUDICE.

3.      Plaintiff's state law claims are REMANDED to the Circuit Court for Dane County, Wisconsin for any additional proceedings.

4.      The clerk of court is directed to enter judgment accordingly.

Entered this 18th day of November, 2015.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge